I'd like to reserve five minutes of the 20 minutes. My name is Robert Coldren. I'm a partner with Hart King & Coldren. I represent the plaintiff and the appellant. Honorable members of the court, you asked us to look into the ripeness issue via fax last week, so I think I'll begin there. Frankly, we're very happy that you have asked us to look into it. It's been 20 years that property owners in California, mobile home park owners particularly, have been knocking at the doors of the federal court trying to get their federal claims adjudicated in federal court. I'm thinking back to cases like Palomar and Mission Oaks and those old cases. The Williamson Doctrine, first off, simply doesn't apply to a number of the causes of action that we've asserted and for summary judgment was very summarily granted. Indeed, in a rather curious way... Could you talk a little louder, please? I'm having trouble. Thank you. Indeed, in a rather curious way, through the issuance of an order to show cause why the court should not treat our previously denied summary judgment as a cross summary judgment and then grant it in favor of the city. And that's how we found ourselves. The procedural history of the case is a very significant and I'm hopeful that the court... Well, why doesn't Williamson apply? Have you exhausted your remedies in state? Absolutely. How did you exhaust them? We went to the city and asked the city at the time the ordinance was adopted to hold hearings, make findings, make a determination about whether rent control was appropriately imposed upon my client or not. Rents were... There's nothing in the record to I'm going to indicate. Is there anything to support it or just nothing to contradict it? No, it's all there in the record and it's uncontradicted. Did you go to court in California? No, we did not. Through all the steps? Excuse me, we did go to court in California. First, we filed in federal court. Federal court said I'm not going to entertain your... As I remember, you filed in federal court. The law was different then. It was pre-lingual. It was pre-lingual, that's right. Then you went to state court and exhausted and then you came back to federal court. But it was the same thing. Exhaustion was all pre-lingual. Did you have a Pullman abstention in there? No, no, no. Thank you. I'm glad because procedural history is important. So let me see if I can give it to you correctly. We filed in federal court under lingual substantial advancement claims. We also had pendant claims dealing with the elections code in California and things like that. District court said, hey, I'm going to stay your federal court claims. You go back to state court and you have a stipulation in the record, in fact, an order signed by the district court indicating that the stay is lifted and that the parties stipulate and agree that it was a new rent control law. In other words, if you'll recall, what happened here was the rent control law was originally adopted by the county of Santa Barbara in 1979. That's the only time there was ever any hearings or anything regarding the legitimacy of this ordinance. Then the city of Goleta decides it's going to become a city and incorporates. And when it incorporated, it purported to adopt en masse all of the ordinances that had been in the county. However, it didn't do it appropriately and properly under the elections code. And that's why it's considered to be a new rent control law. In other words, that's why the district court agreed that there was a gap issued an order that there was a gap and that the city's rent control became effective in 2002. And they don't get the benefit of a relation back to 1979. When was the purchase of the trailer park? 1997. That would be relevant only, of course, to the, quote, investment-backed expectations. The city's ordinance went into effect? In 2001 or 2002. I'm not positive. In 2001. And in 1997, when the plaintiffs purchased the trailer park, was the county ordinance still in effect? Absolutely. That ordinance was the same ordinance that was adopted by the city. In 1979, when rent control came to Santa Barbara, to the county, recognizing the need for a Vega or Concord type adjustment, you're familiar with that, the county actually put in its ordinance an opportunity to get your rents to market. So if your rents weren't at market during the base year, the year rent control came into effect, you were entitled that they had a mechanism to address that constitutional problem of freezing your rents. This Williamson issue is very complex, and I'm sure we'll come back to it. But let me lay out for you what's been on my mind in this case so you can educate me out of it. There's not a physical taking. There's not a deprivation of all economically beneficial use. So as I see it so far, you've got Penn Central or you've got nothing. Then I look at Penn Central, and I look at three factors. The chief one is the economic impact of the regulation on the claimant. And it seems to me there's close to none. The people who really had their wealth taken from them and handed to somebody else by rent control were the owners when the county imposed rent control. They got their wealth taken away from them and handed to whoever happened to be the tenants then. As far as the plaintiffs in this case go, they bought a trailer park with a value that would reflect the consequences of rent control. It's true, according to your report, they're only getting 20 cents on the dollar of the rent that the market should be paying them. But if they bought the place under an ordinance where they only got 20 cents on the dollar of what the market should be paying them, as far as the character of the government action goes, they're adjusting economic benefits and burdens. That's okay under Penn Central. And the extent to which the regulation interfered with investment-backed expectations, none. You're under the same ordinance that there was when the plaintiffs made the investment. So it looks to me as though, although the plaintiffs at the time the county imposed the rent control ordinance might have had a Penn Central claim, your clients don't. Tell me what I'm missing here. Well, you've obviously read Respondent's answer brief. Well, I try to be prepared. I hope you read our briefs with equal precision. Yeah, explain. Okay, number one, the district court didn't even go through the balancing act that you're going through, of course. The district court said, hey, there's no per se taking. Then it went off on investment-backed expectations, the third prong of the ad hoc analysis required by Penn Central. It didn't even address the other issues. We have a report by Professor John Quigley. We're reviewing De Novo, so I don't care if the district judge did a good job or a bad job. It's De Novo. All I care about is how did your guys get hosed? Awesome. Let me tell you how that occurred. Number one, in 1997, when they purchased the mobile home park, they didn't purchase a mobile home park with the expectation that there would be an invalid regulation applied to them. That's the teaching of the Palazzolo. Wait a minute. They purchased the mobile home park while rent control was in effect. Absolutely. And if it were the rule that one who purchases a piece of property subject to an unconstitutional or invalid law, one that serves to confiscate fully 80 percent of the value of the property, were that the law? If one can take and be forever bound because they bought, knowing that 90 percent of the value of their land is being transferred, not even to government. It seems to me that what they need to do in order to stand in the shoes of whoever really did get their money taken from them is not only buy the land, but also buy an assignment from the trailer park vendor of the claim. Well, in any event, the first problem here is that there's no evidence in the record that in 1997, rents were in, that 80 percent of the value had been transferred. You're probably right, because land values have gone up. They've skyrocketed, of course. So there you get into a question of when does it become a taking. And we know that it can become a taking at a variety of points in time. We're saying it's a taking when they adopted a new rent control law. They didn't have to adopt that new rent control law. There was a gap in the law, and they certainly didn't have to adopt it, which is what happened here. So the baseline is 2002. The question is, was my client subjected to an unconstitutional law in 2002? And the answer is yes, or 2001, when it was adopted. The investment-backed expectation issue, I would direct your attention to the Palazzolo case, which I think is a very sound pronouncement that says there's no expiration on a constitutional invalidity. In terms of an ad hoc analysis under Penn Central, indeed, every single factor weighs decidedly in favor of a grant of summary judgment in my client's favor, as opposed to certainly not a grant of a summary judgment in favor of the city. Number one, as I pointed out, unimpeached testimony that fully 80 percent of the value of my clients, 80 percent of market rents are not being charged. That rents are 20 percent of market. That's number one. Number two, unimpeached expert testimony by Professor John Quigley, that there is a 90 percent premium transfer. Ninety percent of the value of my client's land is being transferred to these tenants every time a mobile home turns over in my client's mobile home park. And by the way, that's not as of 1979. That's not as of when the prior owner owned the property. That's as of 2001 forward, okay? The unimpeached expert testimony is that the city has a set-aside for affordable housing where it requires new developers, people who are going to burden the system with traffic impacts and everything else, that they have to commit 20 percent of their housing to income-qualified affordable housing. In our case, to the contrary, the evidence is that we're required by government to dedicate 90 percent of the value of our wealth and our property to not necessarily even income-qualified people and not to even support affordable housing because there's no income qualifier issue there. So in this case, it seems to me manifest that my client is being asked to bear a burden that ought to be borne by society at large. This is exactly what Penn Central speaks to. Exactly. So in any of... Could you come back to the Williamson County issue? Why wouldn't the plaintiffs have to sue in state court for inverse condemnation? For a variety of reasons. The ordinance was passed. For a variety of reasons. Reason number one, a number of the claims for which the district court granted summary judgment are simply not subject to Williamson at all, the equal protection claim. The substantive due process claim is not subject to Williamson and Sierra Lakes has been the law of the land forever. And yet, Sierra Lakes City of Brocklin has been the law of the land forever and yet the district court apparently ignores that in granting summary judgment on the issue of capital discretionary rent increase for capital expenditures. We allege and the record shows... But if Judge Kleinfeld is correct that what you really have at this point is either Penn Central or nothing, then isn't the Penn Central claim subject to Williamson? The Penn Central... First off, respectfully, when Judge Kleinfeld says you have Penn Central or nothing, he can't be speaking about Penn Central is subsuming all these other claims because they quite simply don't. There is a substantive due process claim that's a standalone substantive due process claim. But if the substantive due process claim is not subject to Williamson, then perhaps we can consider your substantive due process claim. I'd like to know whether we can consider the takings claim and whether that is subject to Williamson. Wonderful. I just wanted to make it clear that even if at the end of the day you believe that Williamson bars relief, it doesn't bar private takings, which we've alleged, it doesn't bar equal protection, and it doesn't bar substantive due process, all of which we've alleged, and it doesn't bar the declaratory relief aspect of our takings claim either. Now let's get to Williamson and thank you for letting me get there. First off, futility. In 1999, the court in, I think it was, oh yeah, in San Remo in 1999. If you're going to make a futility argument, counsel, I just want to make sure up front then that you are not arguing that you have in fact exhausted these claims through the state system. Well, we are. We think there's nothing to exhaust. We think there's a distinction between an as-applied takings claim and a facial taking claim. And in fact, factually in this case, there was a motion to dismiss Broad in connection with the original complaint, and that motion was granted with respect to all as-applied claims. So all as-applied claims came out of the pleading. It resulted in the first amended complaint. That's why the first amended complaint seeks only, has only a facial takings claim. So you don't think that Williamson applies to facial claims? That's correct. Because as we've learned from the Sudom case, Williamson is a prudential rule, not an Article III jurisdictional rule. Let's say for, and as I think Justice Rehnquist has pointed out, isn't it odd that the only constitutional protection, the only constitutional right in the federal constitution that is subjected to this Catch-22 situation that we have under Williamson, which is a judicially created doctrine, is the Fifth Amendment. Isn't that strange? Let's assume that the city of Goleta in 2001 had passed a law saying that slavery is lawful and black people are enslaved. Surely this court wouldn't purport to say, well, I'm sorry, it's a federal right, but you have an adequate remedy in state court. We think state judges will treat you fairly. You should go through the state system. Well, Williamson is funny that way. Some Supreme Court justices have wondered about that for just that reason. Yes, and four of them, four justices. This is a takings claim. It's not another kind of constitutional right. But you have to be able to count to five to get any sympathy from this court. Okay. You know what? I thought about that because I thought, why in the world would this court even want us to brief rightness, because as the law now stands, we have the Supreme Court saying it might be time to revisit rightness. But why would the Ninth Circuit be interested in revising rightness? Well, I guess what we were trying to figure out was whether you in fact exhaust. There's a whole bunch of stuff here about, some mystery about what happened once you went back to the state court. Well, now, hopefully I've cleared that up. The only thing we went back to state court on was our state court, state law elections code claims. Okay. So your claims are, one, you're not required to exhaust because this was the facial claim. Two, if you were required, it was futile. But I didn't hear an argument that you did in fact try to exhaust all these claims through the state system. If you're asking, if you're asking me the question, did we exhaust, my answer to that is yes. If you're asking me the question, did we file a state court lawsuit seeking compensation for a taking, the answer is no. I mean, it doesn't have to be a state court lawsuit. It might be as simple as filing a claim with an administrative agency. Well, that's an interesting question you raised. So what are we supposed to do? You're right. We're supposed to go to an administrative agency. Remember, the point of our lawsuit here is that the ordinance that the administrative agency is bound to follow specifically does not include a just return analysis. I represent hundreds of park owners. I've dealt with dozens of ordinances. Virtually all of them have a savings clause that says that here's the formula you use when considering a rent increase. But by the way, if it doesn't provide a just and reasonable return, administrative agency, give a just and reasonable return. This ordinance not only doesn't have that clause, it has exactly the opposite language. It says the arbitrator is not entitled to give anything for a reasonable return on investment. I still missed a step there. Why not sue in state court for inverse condemnation? That kind of begs the question. Why should the federal court doors be shut? Because of Williamson. Well, except I've just indicated that there are about seven independent reasons, any one of which standing alone would allow us to be here in federal court. And taken collectively, they surely allow us to be here. I mean, we have a Kavanaugh adjustment. The California Supreme Court's telling us that the only thing we can do ever... Williamson and before that funny exception came in under Yee or something, and then the exception got eliminated, maybe that was Yee. No, Yee is the case that says that it's not a physical taking. But anyway, the only way anyone could get condemnation claims into federal court was when either the feds took the land or it was taken from an Indian. Everybody else went to state court. Or if it was a private taking, ordering the substantial... I actually understand what you mean by private taking. There's a whole line of cases that affords a remedy for private taking, which is invalidation of the ordinance. And those, there's no Williamson exhaustion requirement. What's the private taking? It's where government doesn't take the property for the public benefit. It's where government takes the property and gives it to another person, as in this case, where they've taken 90% of the value of my client's land and have conveyed it to the tenant. And that's private taking. No, they didn't convey the land. They just transferred the economic benefit of land ownership. For which there can be no Williamson exhaustion requirement, of course. Why not? Well, because government can never take... The whole idea behind Williamson, it says stop now, but the whole idea behind Williamson is that because you have to seek and have been denied just compensation... There was a case that was lost in the Supreme Court about a year ago where the city took land from working people and gave it to a shopping center developer. That was a private taking. Exactly. Connecticut case. Exactly. That's not this case. This case is a trailer parking case. That is, Judge Goodwin, this is that case. That was a conveyance. Their title moved here. It's not title. It's just economic benefit. That's true. And so that's why it comes into the Penn Central analysis. Well, this is where the beneficiaries of the rent control law... One of the incidental beneficiaries is the owner of the unit parked on the trailer park land. And the owner of the unit gets the big write-up because he's selling a rent-controlled... He gets to put the cash in the bank from selling a rent-controlled property to somebody who wants to buy it because it's rent-controlled. Right, because of the confluence of two banks. And, of course, your people have had that wealth transferred in that manner. But don't you have to, if you want to establish a taking, don't you have to establish it in the state court that this is a reverse condemnation of your share of the wealth generated by that land owner? No, Judge, because the only time under any analysis you have to go to state court before you can come to federal court, even under Williamson and all these other cases, the only time you have to do that is where just compensation will solve the problem. And where you have a private taking, as in Kelo, for example, all the compensation in the world won't solve the problem. In fact, in Kelo, they paid for the property. Well, Kelo, that was the big earthquake there was. It changed public use to public purpose. Now, the Constitution says public use. And the court said, oh, well, public purpose is the same thing. Of course, it isn't really the same thing, but they had the votes to say that. Well, I'm two and a half minutes over my time, and I do want to talk. Well, this is an interesting case, and we've taken a lot of time with questions. May I go? May I just rattle off a few of the other reasons why we're here? You better just wrap it up. Okay. Okay. Yeah, let him wind it up. Okay. May I? Okay. So we have futility. We have declaratory relief. None of that's Williamson. We have facial versus as applied, and our view is that it only applies to an as applied challenge, the Williamson doctrine, not to a facial challenge. And that simply is axiomatic, because in this case, there is no right under the ordinance, under any circumstance, to get a return based upon the constitutionally required standard. We have the other claims that survive even if all of our Williamson arguments turn out not to be any good. And finally, I'd like to leave you with this thought. Again, I was thinking, why is it that the Ninth Circuit wants to know about rightness if it's only a four-judge plurality that's saying they'd like to revisit the Williamson doctrine? I would submit that since SUDM stands for the proposition that it's not an Article III issue, but rather a, i.e., not a jurisdictional issue, but rather a prudential rule, I would submit that as a prudential rule, much as you can engage in an ad hoc analysis, as you would in a Penn Central kind of balancing, you can do the exact same thing when dealing with Williamson. In other words, if it's not jurisdictional, that means it's discretionary. And if it's discretionary, that means that you can say, look, in this case, it's time for this particular litigant to finally, after 20 years of banging at the door, have a right to vindicate his federal constitutional rights in federal court. Thank you, counsel. Good morning, Your Honors. Amy Morgan on behalf of the city of Goleta. What I wanted to do to give you a little roadmap was to talk about three issues subject, of course, to questions. The first was rightness in response to your facts last week, also to talk about the actual ordinance that's on challenge here, and then finally to explain why it's not unconstitutional. With respect to the rightness issue, Williamson, as noted, sets a two-part test. The first is whether the administrative action underlying is final, and second, whether the claimant unsuccessfully attempted to obtain just compensation under state procedures. We have a recent case from this court, the Equity Lifestyle Properties, Inc. versus County Assemblies FISPA case, which is 505F3-860, and that's a September 2007 case. And that case specifically talks about the Williamson standard and how it applies to a facial takings claim, which is what we have here. And what that case says is that the first prong of Williamson doesn't apply, but the second prong does apply. And to answer the question of whether the claimant unsuccessfully attempted to obtain just compensation, you analyze whether a state law remedy existed when the ordinance was adopted. Here the ordinance was adopted in February of 2002. There was a state law remedy, which is an inverse condemnation and Kavanaugh adjustment, and the park owners conceded that they didn't do that. With respect to the futility argument, that has been rejected by this circuit twice in Carson Harbor Village Limited, 353F3-824, and in the Equity Lifestyle Properties case.  Is that right? In response to your question, when I went back and looked at it and saw this Equity Lifestyles case, when I first looked at your question, I thought, well, I'm not sure it applies to a taking, to a facial takings. But then after reading the Equity Lifestyle case, I think, yes, their takings claim is not right. They have not sued for inverse condemnation in state court. Okay. Now, have you forfeited that argument? No, because actually in the trial court, we filed a motion, a 12B6 motion on rightness issues, and the court rejected it based upon essentially You didn't brief it? I didn't brief it in this court, no. Okay, so why haven't you forfeited it? I believe that this court has the ability to raise such issues. Okay. But is it in our discretion? Is this jurisdictional or is it prudential? I think that the Williamson issue is prudential. I think that rightness Which means then that we're not compelled to reach it as a matter of determining our own Article III jurisdiction. So it would be then prudential with our court. I think that if you're dealing specifically with Williamson, it is prudential and you don't have to reach it. However, rightness is, of course, an issue that always has to be addressed, the general rightness issue. If it's a jurisdictional matter, if it goes to our Article III jurisdiction, if it's prudential, then that suggests that it doesn't go to our Article III jurisdiction. That's correct. What I'm saying is you could look beyond the straight Williamson factors and say because this park owner hasn't sued in state court, hasn't done those things, it's not right for us to review and not even base it upon Williamson. That's what I was saying. With respect to the due process claim, the park owner is arguing that rightness does not apply to that issue. There's a couple cases from the circuit on that point. The first is Amendores v. Penman, 75 F. 3rd, 1311. And that case talks about the fact that when you have an explicit textual source of a constitutional right, like you do here with the Fifth Amendment, saying that you can't take property without just compensation, the generalized notion of substantive due process is not the way that the plaintiff is supposed to go. The court in that case stated that permitting a plaintiff to bring a substantive due process claim whenever his claims under other constitutional provisions are unsuccessful gives the plaintiff under substantive due process analysis protection which Constitution does not afford. And Marcy v. King County, 126 F. 3rd, 1125, confirmed that that analysis applies as well. Help me with something here. You already know from my questions to your adversary how I'm thinking. Why isn't it a new ball game when the city adopts the ordinance in 2001-2002 so that the plaintiffs can say, Oh, gee, once you messed up and the ordinance went out of effect, the value of our property skyrocketed because we got to keep the economic value that the old ordinance had taken away. And then you pass this ordinance. You finally get your act together and you pass this ordinance. And again, a whole lot of our value, which we got through a windfall, but so does anyone who inherits property or any other way other than paying fair market value. Yeah, we got it through a windfall, but it was worth a whole lot more. And then you got your act together and you passed the ordinance properly in 2002, and bam, our wealth is transferred from us to our tenants. Why isn't that a good inverse condemnation case? Okay. I think what basically that goes to is the economic impact factor of Penn Central. Yes. And there's a few arguments on that. One is that it's basically when you're saying you're transferring wealth, you're saying that you're diminishing what I have. You're lowering what I have. And the courts have made it very clear that just diminishing value in and of itself is not a taking. There is the Haas v. City and County of San Francisco case that, in that case,  this is an easier case for a plaintiff to make than what we have here, which is a facial taking. And in that case, with the easier burden, the Ninth Circuit stated that a $2 million reduction down to $100,000 was not a taking. That case cited the Haticek case from the Supreme Court, where there was an $800,000 down to $60,000 diminution in value. What caused the diminution in value? In Haas, it was a zoning change. Okay. This isn't a pure zoning change. Here's the problem that I see here. It looks like what the city of Goleta has done, and of course they're just following what other jurisdictions in California have done, including Santa Barbara County, is that you have said, property owner, you can't charge the full value of the rent. The rent is being recouped elsewhere. It is being recouped by the folks who have got their trailers, their mobile homes, parked on the owner's pad. And it's pretty clear from Professor Quigley's testimony that he thinks that there's a pure wealth transfer being accomplished here, and he's quantified it. It is the rough equivalent, as if the city of Goleta had said, park owner, you may charge whatever you want for rent, but we are going to give these folks a housing voucher, which they can cash, like food stamps. And they can use it to pay your rent, and then we'll pay it for you. Now that would accomplish the same thing on behalf of the owners of the mobile homes, wouldn't it? If you gave them $1,000 a month in housing vouchers, that would accomplish roughly the same thing that's been accomplished here. The difference is that if you gave them a $1,000 a month housing voucher, that would be paid for across all of the citizens of the city of Goleta, not simply the park owner. But that's what's happened here is the park owner is paying for all of it. Well, I obviously would disagree with that. First of all, the 90% transfer of wealth, that only happens if the coach is sold. So you only reach that issue if there is a sale. And the purpose of the statute, which all the residents that are currently living there and have been living there for many years, are getting the benefit of rent control. Can these folks refinance? Yes. Can they refinance at the price at which the house would sell? I don't know the answer to that. I know that the rates are much higher. If the answer to that question is yes, then you don't have to sell this house in order to get the benefit, do you? No, but I don't know the answer to that, and it's not in the record. The only thing I do know is that for park mobile home owners to refinance, they pay a much higher rate than a house would, for example, because they don't own the land. There's also evidence in the record that there were coaches that sold, coaches that were not covered by rent control, because not every mobile home in this park is covered by rent control, that those sold, and there was a similar premium. And that is in the excerpts of record at 1072-1102. So the city showed in the trial court level that there is this premium whether or not rent control exists. So that undercuts the argument that the only reason that there's a premium is rent control. I would submit that the reason there's a premium is because it's Goleta, it's by the ocean, and land values have increased in California, period. And that's irrespective of whether rent control is there or not. Let me see. So you're saying that there's a genuine issue of fact about whether there is a premium that's given, that the seller can extract on account of rent control. No, what I'm saying is that I will assume for purposes of the brief and the argument that he's right, but if we did go back to court, there would be an issue. And I guess I wanted to just let the court know that it's not just black and white like he's saying. And if we did go back and have to litigate it, there would be an issue about it. But that just goes to the question of damages. In other words, you want to argue that because this premium is being collected by people who don't have a, are not subject to rent control, that the owner, his damages aren't as great as they might otherwise be. Well, that's if he actually filed an inverse condemnation claim in state court, that could be litigated, which he hadn't done here. There is. But he can't do that, can he? He can't do what? File an inverse condemnation claim? If he files an inverse condemnation claim, what happens? What happens? Yeah, what happens in state court? Futility. Nothing. Well, I think that two panels of this court would disagree with you in saying that it's not futile and that there is the Kavanaugh. So I would submit that. I'm confused about it. Could you just amplify that a little? On the Kavanaugh issue? Yeah. The Kavanaugh is a California Supreme Court decision that talks about a method that a park owner can use to adjust rents to recover lost profit, basically. And that hasn't been attempted here. When we talk about economic impact, I think that it's important to remember that just because there's an economic impact and just because it might be more severe on one property owner than another, the case makes it very clear that that in and of itself is not a taking. That's in the Penn Central case itself. It's also the Pinel v. City of San Jose case talks about the fact that the city may legitimately protect consumer welfare. That's a legitimate and rational goal. The Yee v. City of Escondido case also talks about how the cities have broad power to regulate landlord and tenant relationships. It is subtle that rent control is acceptable, is a legitimate government operation. So to the extent that that's the premise that's being challenged here, I don't think that's even an open question. The issue really is whether this ordinance passes constitutional muster, whether this ordinance is not a taking, is not arbitrary, capricious, unreasonable. And we haven't talked about what the ordinance actually says, but I think maybe we should spend a couple minutes doing that. 11A1 of the ordinance goes into the purpose for it. It talks about the shortage of housing units, the low vacancy rates, the exorbitant rents, the unique circumstances of mobile home owners who own the mobile home but not the land underneath it. And they talk about how to alleviate the hardship of those problems, they're going to use rent control. The 11A5 of the ordinance talks about rent increases. It allows the park owner an automatic 75 percent of the consumer price index increase every year. If they want more than 75 percent, they can provide notice of that. If the tenants object, then there's a hearing process. In determining granting an over 75 percent increase, Section 11A5I states that the arbitrator shall grant half of the automatic increase as a just and reasonable return on investment. So to the extent that the park owner has argued that there's no mechanism to increase rents, it's simply belied by the actual text of the ordinance itself. With respect to capital expenses and capital improvements, that's in 11A6. So there is a mechanism, there is a process by which the park owner can get rent increases, can put through capital improvement expenses, can talk about costs going up, property taxes going up, all those things can be considered to increase rents. That ordinance is good enough to pass a facial test for taking this due process and equal protection. We talked a little bit about the Penn Central factors, and I wanted to touch on the interference with investment expectation. Here, the park owner had no reason to believe that rent control would not continue when he bought this property. So to claim that or to say, well, it doesn't apply, would really give him more than he bargained for. Oh, I think you've got a solid case on that. They bought it subject to rent control, it's subject to rent control now under the same deal, and they're getting just what they paid for. The problem is that in between, they got a windfall, and now the windfall has been confiscated. It's entirely theoretical. If your grandmother leaves you Penn Station, you don't have any investment backed expectations at all, but there are still limits on how much the government can diminish your wealth. True. But, yes, that's true. But the limits have not been exceeded here. There were the Haas case and the Haticek cases where those were extreme diminutions in value. Those were found to be not a taking. And if you look at the straight Penn Central factors here, even with the windfall argument. I've always had trouble understanding that. Lay out the concept for me. Why isn't it a taking? If the government says, yeah, you keep title under a new rule so that you're only going to get 10% of what it was worth when you bought it. Well, of course, I don't think that's the case we have here. Let's say, hypothetically. If they did. Well, I guess the cases, they talk about balancing the other factors, and if there is a legitimate government purpose. And I guess you would have to look at it and see if it was enough. If it went too far, to use Justice Holmes' terminology, then it would be a taking and they would have to get compensation. But the Constitution allows the government to regulate. It allows the government. You're talking about zoning now, right? Zoning and rent control, it's established. I mean, there's a wealth of cases that talk about the city has a legitimate ability in its police power to protect consumers. This is not new. The cases go, I mean, he talks about it. Panel versus City of San Jose talks about it. That's not new territory. Those are Supreme Court decisions. And it isn't just zoning. Those are rent control issues. Rent control is a legitimate exercise of police power. The issue is whether it, I guess, goes too far, essentially. And plaintiff's burden here is a facial takings claim, and he has to show that under no set of circumstances can this ordinance be applied in a constitutional manner. I mean, I think that's important to go back to that issue, but that's what his burden is, and that has not been met here. There's no evidence that there's no possible way that this ordinance can be constitutional. That simply has not been established. I think one of the points that you were talking about, Justice Kleinfeld, was the city's re-adoption of the ordinance, and the plaintiff has argued that it was arbitrary and unreasonable to do so. And I would counter with that, that this is an ordinance that the city, well, first let me start by saying Government Code Section 57376, which is a California statute, it requires new cities to immediately adopt the existing county code. And the reason for that is to ensure consistency in government, because when a new city forms, they don't have staff. It's like a baby being born. There's nothing there. So they have that. Most cities continue to re-adopt the code. There was some weird procedural problem here that it wasn't done properly, but it continued to be adopted. And it's not unreasonable and arbitrary for a new city to continue to adopt a code that has been in existence. It's not unreasonable for a city to say, this rent control has been in existence since 1979, and we're going to continue with that. That's not an unreasonable exercise of government power, given the fact that rent control is a legitimate public purpose. It's a legitimate police power. It's simply not unreasonable for the city to have continued the law that was already there, that was already operating, that was in existence when this park owner purchased this mobile home. I don't think I have any other comments unless there's more questions. Thank you, Counsel. Thank you. I'd like to dispose of a couple of issues. First, opposing counsel raised an issue saying that the ordinance provides for a capital expenditure recoupment process. It specifically does not. And, in fact, that's one of our beefs here, is that the district court refused to allow our reply brief that was filed on my birthday, September the 6th of 2006, and to consider it in the context of her order granting summary judgment for the city. And that's one of the things our reply brief pointed out. It pointed out that the city makes the argument, and it's incorporated into the district judge's decision, that the ordinance allows for a recoupment of this capital expenditure pass-through issue, which is required under Ninth Circuit decisions, under Sierra Lakes and Hillsborough and other decisions. But factually, and you have the ordinance in the record, factually there is no such opportunity under the ordinance. Also, counsel read to you portions of the ordinance saying, well, gee, we can get half of 75 percent of a CPI increase, and we can apply for more if we want it. I would just encourage you, I don't have the time right now to do it, but I would encourage you to make sure you're aware of what the ordinance provides in that regard, because there's a sentence right in there that says, provided, however, that under no circumstances shall the arbitrator be entitled to award any dollars for a, quote, reasonable return on investment, close quote. Exactly the opposite of what every other ordinance in the state of California says. I also want to indicate that I will draw the court's attention with respect to your question, Judge Kleinfeld, about the gap issue. First off, I'm going to get a transcript of this naturally for my client to hear, and he'll be interested to hear about the windfall that he has obtained when we're comparing that to a windfall of blue book values of these mobile homes of $10,000 and these residents are selling them for hundreds of thousands of dollars in my client's mobile home park. Could you, someplace here before you finish up, and you're over time, the presiding judge has been very generous to you, can you address the Kavanaugh question? Yes, I want to make one other point, then I'll get to that. The other point is, look at the record, volume two, page 304. It is where the city plaintiffs and defendants have stipulated and agree that factually and legally a gap in time exists, commencing about the time when the city was incorporated, when plaintiffs' mobile home parks were not subject to either mobile home rent control ordinance of the county or any other ordinance. Then they go on to say, for that reason, the parties have factually and legally stipulated and agree with the court's orders of October 3, 2002 and December 13, 2002, and have further agreed that no party will appeal from such orders. Could you address Judge Bybee's question and then close it up? Thank you. Your question is? With Kavanaugh. Okay. As to why you don't have to, what Kavanaugh is and why you don't have to. Kavanaugh is a remedy invented by the California Supreme Court when it decided that all regulatory takings claims needed to be treated as due process claims. If it looked and acted and smelled like either a due process claim or a takings claim, it needed to be characterized as a due process claim. Therefore, the California Supreme Court said that the remedy for a violation of a due process claim is not just compensation, but rather a remand to the administrative agency to give you what's called Kavanaugh adjustment. In other words, if it's found that you're not getting a fair and reasonable return, you don't get takings damages. Instead, what you get is the right to go back and get a rent increase sufficient to make you whole. What are the problems with the Kavanaugh adjustment? Number one, 1999 in Carson Harbor, this court said, you know what, we can't rule on Kavanaugh right now because we haven't seen how it works in California. Well, we're down here eight or nine years later, and if we are allowed and sent back down and allowed to present our case, we'll show the district court how Kavanaugh adjustments in California work. Let me just give you some examples that you don't need to look to extrinsic evidence for. Number one, who pays the money in a Kavanaugh adjustment? Government does not pay the money. Tenants pay the money if the market will bear that amount of money. So that's not just compensation. That's not a federal remedy. That's not a remedy for a takings clause. Number two, what is the standard of review respecting the sufficiency of the amount that's awarded? Well, guess what? Under Kavanaugh, you are sent back to the exact administrative agency that the court already found didn't treat you in a constitutional fashion in the first place, and you're told to go back to them and ask them to figure out how much it's going to take to make you whole. And what happens if you don't like it the second or third or fourth or fifth time around that you've been sent back in this Kavanaugh mandamus proceeding? What happens? Oh, you get to go back to the state trial court and tell the state trial court, the administrative agency didn't treat me fairly, and what standard is the state trial court going to use now in evaluating what would otherwise, in federal court, be a just compensation claim? They're going to use the standard of not substantial evidence, but indeed abuse of discretion. In other words, they're going to say, is there any evidence in the administrative record below to support what the administrative body did? I see I'm way over time. I could have gone on and on, but you need to look at Kavanaugh. Thank you, Judge. Thank you, counsel. Thank you, Judge. Guggenheim v. City of Goleta is submitted.
judges: Goodwin, Kleinfeld, Bybee